1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 ANTUAN WILLIAMS,

11           Plaintiff,               No. CIV S-03-0615 DFL GGH P

12     vs.

13 PLILER, et al.,

14           Defendants.         <u>FINDINGS & RECOMMENDATIONS</u>

15 _____/

16 I. <u>Introduction</u>

17         Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to

18 42 U.S.C. § 1983. This action is proceeding on the second amended complaint filed May 16,

19 2005. The defendants are Warden Pliler, Chief Deputy Warden Rosario and Captain Vance.

20 Plaintiff alleges that he was subjected to racially discriminatory lockdowns on January 4, 2002,

21 May 8, 2002, and December 28, 2002. Plaintiff also alleges that he was denied access to exercise

22 and visitation during these lockdowns in violation of his constitutional rights. Finally, plaintiff

23 challenges a policy prohibiting him from possessing publications containing frontal nudity.

24 Plaintiff seeks both damages and injunctive relief.

25         Pending before the court are cross-motions for partial summary judgment. On

26 April 14, 2006, defendants move for summary judgment as to plaintiff's claims alleging denial of

1 exercise and visitation as well as the claim challenging the ban on publications containing frontal

2 nudity.  While defendants' label their motion as one for summary judgment in the entirety, the

3 motion contains no briefing addressing plaintiff's Equal Protection claim.  On April 19, 2006,

4 plaintiff filed a summary judgment motion addressing only his Equal Protection claim.  In their

5 May 10, 2006, opposition to plaintiff's motion, defendants argue that they are entitled to

6 qualified immunity as to the Equal Protection Claim.  Accordingly, the court construes

7 defendants' opposition to be a partial motion for summary judgment.

8        After carefully reviewing the record, the court recommends that the motions be

9 granted in part and denied in part.

10 II.  Summary Judgment Standards Under Rule 56

11        Summary judgment is appropriate when it is demonstrated that there exists "no

12 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

13 matter of law."  Fed. R. Civ. P. 56(c).

14        Under summary judgment practice, the moving party

15 always bears the initial responsibility of informing the district court
of the basis for its motion, and identifying those portions of "the

16 pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any," which it believes

17 demonstrate the absence of a genuine issue of material fact.

18 Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

19 P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

20 issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

21 depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

22 should be entered, after adequate time for discovery and upon motion, against a party who fails to

23 make a showing sufficient to establish the existence of an element essential to that party's case,

24 and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

25 "[A] complete failure of proof concerning an essential element of the nonmoving party's case

26 necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

1 should be granted, "so long as whatever is before the district court demonstrates that the standard

2 for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at

3 2553 .

4    If the moving party meets its initial responsibility, the burden then shifts to the

5 opposing party to establish that a genuine issue as to any material fact actually does exist. See

6 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

7 (1986). In attempting to establish the existence of this factual dispute, the opposing party may

8 not rely upon the allegations or denials of its pleadings but is required to tender evidence of

9 specific facts in the form of affidavits, and/or admissible discovery material, in support of its

10 contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

11 106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is

12 material, i.e., a fact that might affect the outcome of the suit under the governing law, see

13 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

14 Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

15 dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

16 nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

17    In the endeavor to establish the existence of a factual dispute, the opposing party

18 need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

19 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

20 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary

21 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

22 genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

23 56(e) advisory committee's note on 1963 amendments).

24    In resolving the summary judgment motion, the court examines the pleadings,

25 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

26 any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On May 16, 2003, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

III.  Claims Involving Lockdowns: Equal Protection, Exercise, Visitation

A.  Undisputed Facts

*Background*

On April 14, 2006, defendants filed a statement of undisputed facts.  On June 26, 2006, plaintiff filed a statement of undisputed and disputed facts in response.  Plaintiff addresses defendants' undisputed facts at page 12-42 of this pleading.  Because plaintiff's pleading did not address all of defendants' facts, he filed a supplemental statement in response on July 21, 2006.  Plaintiff has made numerous objections to defendants' facts which the court will address below.

Plaintiff's motion for partial summary judgment also contains a statement of 14 undisputed facts.[1]  On May 10, 2006, defendants filed a response to plaintiff's undisputed facts which the court will address below as well.  The court observes that several of plaintiff's

---

[1]  Defendants state that plaintiff has identified 17 undisputed facts.  The court can only find 14 undisputed facts by plaintiff.

1    undisputed facts are not material to his claims.  Plaintiff's undisputed fact nos. 2, 8, 9, 11 and 13

2    concerning the processing of administrative appeals filed by plaintiff regarding the at-issue

3    lockdowns are not material.  Plaintiff's undisputed facts nos. 3 and 4 stating that plaintiff filed a

4    complaint regarding the lockdowns with Russ Heimerich, the spokesman for the Department of

5    Corrections, are not material.

6         Plaintiff's undisputed fact no. 7 states, "Considering California Department of

7    Corrections, rules and procedures prohibit lockdowns in excess of 72 hours without the express

8    authorization of the Director, Regional Administrator/Assistant Deputy Director–to deny facility

9    operation e.g., an academic or vocational program, visiting, yard operation and dining review."

10   Defendants object to this fact on grounds that it is vague, ambiguous and unintelligible.  The

11   court agrees.

12        Accordingly, the court considers plaintiff's undisputed facts nos. 1, 5, 6, 10, and

13   12.  They will be discussed below to the extent they are disputed.

14                     *Plaintiff's Objections to Defendants' Exhibits*

15        In his opposition to defendants' motion, plaintiff argues that defendants' Exhibits

16   A, C, D, F, G and H should be stricken.  Exhibit A consists of documents containing plaintiff's

17   chronological history of confinement.  Plaintiff objects that these documents are not relevant.

18   These documents are relevant to the extent they demonstrate when plaintiff was incarcerated at

19   California State Prison-Sacramento (CSP-Sac) where the at-issue events occurred.  Accordingly,

20   plaintiff's request to strike exhibit A is denied.

21        Exhibit C is the declaration of D. Willey, who was the Acting Captain of Facility

22   B at CSP-Sac from September 2, 2003, to September 19, 2003, and from October 14, 2003, to

23   January 16, 2004.  Exhibit D, ¶ 3.  Defendants cite Exhibit C three times in their 94 undisputed

24   facts: nos. 72, 73 and 83.  As will be discussed infra, facts no. 72 and 73 are not relevant to

25   plaintiff's claims, and the court has not considered fact no. 83.  Because the court has not

26   considered the portion of the Willey declaration cited by defendants, it need not consider

1   plaintiff's objections.

2          Exhibit D is the declaration of J. Walker.  He has worked at CSP-Sac since 1987.

3   From 1999 through October 2003 he worked as the Facility Captain for A Facility.  He was also

4   the Associate Warden of Facility B in September 2003.  From September 2003 to December

5   2005, he was an Associate Warden.  In December 2005 he became Chief Deputy Warden, and he

6   is now the acting Warden.  In his declaration, J. Walker discusses lockdown policies.

7          Plaintiff objects that J. Walker has no knowledge of the facts of his case because

8   he was not present in Facility B in 2002.  Based on his position as Associate Warden of Facility

9   B in 2003, J. Walker has some knowledge of the recent history of this facility.  In addition, much

10  of J. Walker's declaration addresses policy, of which he is knowledgeable based on the various

11  positions he has held at CSP-Sac.  Accordingly, plaintiff's objections to exhibit D are without

12  merit.  Defendants' undisputed facts to which plaintiff has objected solely based on J. Walker's

13  qualifications are undisputed.

14         Exhibits F, G and H are forms entitled "Crime/Incident Report."  Plaintiff objects

15  that defendant Rosario refused to produce these documents during discovery proceedings.  In his

16  objection, plaintiff cites discovery requests addressed in his motion to compel.  In his January 12,

17  2006, motion to compel plaintiff requested 115 disciplinary reports.  See March 15, 2006, order.

18  The Crime/Incident Reports contained in exhibits F, G and H are not encompassed by the request

19  for disciplinary reports.  Accordingly, plaintiff's objection to these exhibits is without merit.

20             *Undisputed Facts*

21         On August 1, 2001, plaintiff was transferred to California State Prison-

22  Sacramento (CSP-Sac).  At all relevant times to this action, plaintiff, an African American

23  inmate, was incarcerated at CSP-Sac in Facility B.  At all relevant times to this action, defendants

24  were employed at CSP-Sac.

25         Since its creation, CSP-Sac has been a Level IV prison, i.e. a maximum security

26  prison.  CSP-Sac is organized in three identical sets of buildings – Facility A, B and C – with

1   each facility comprised of eight blocks and each block consisting of 64 cells and 128 beds.

2         Facility A is considered a "soft" yard.  This is because the inmates housed in

3   Facility A are the former "protective custody" inmates, or those with "sensitive needs."  These

4   inmates tend to be very compliant and generally non-violent.  This is a mellow yard where there

5   may be one serious incident per year.  Facility C generally houses inmates who want to program

6   and stay out of trouble.  Facility B traditionally has housed inmates who refuse to program and

7   consistently get into trouble.

8         During 2002 and 2003, approximately 1000 prisoners were confined in each of the

9   three facilities at CSP-Sac.  The prisoners in each facility were of all races and ethnic groups –

10   Black, White, Hispanics, Asians, American Indians, etc.  At CSP-Sac, each facility is self-

11   contained and built around a yard where inmates are allowed to exercise daily.  Each facility also

12   has four small yards, also referred to as concrete yards. There is one concrete yard between each

13   of the eight housing units.  These are very small yards measuring about 50 by 50 feet.  At most,

14   about 20 inmates can be placed on these yards at a time.  In certain circumstances, however, one

15   or more of the several concrete yards has been used as areas for inmates to exercise in modified

16   programs, but only when staff are certain that inmates will not assault one another and it is safe

17   to release inmates to such yards.

18         In their statement of undisputed facts, defendants generally describe lockdowns

19   as,

20         the restriction of all inmates to their cells/dormitory beds encompassing no less
            than a housing unit.  True lockdowns are rare occasions, generally following very
21         serious threats to institutional security and safety of staff and inmates.  During a
            lockdown, all normal programming is suspended until it is determined that it is
22         safe to resume to normal programming.

23   Undisputed fact no. 10.

24         Plaintiff objects to undisputed fact no. 10 on grounds that lockdowns are defined

25   in Cal. Code Regs. tit. 15, § 3000.  The definition of lockdowns in § 3000 is not inconsistent with

26   the information contained in undisputed fact no. 10.  Accordingly, plaintiff's objection to this

1    undisputed fact is without merit.

2            Normal programming means inmates attend work and education programs.  They

3    are released to the yard for recreation in large groups according to their yard schedule.  The yard

4    population is limited to 150 inmates at a time.  Inmates have regular visiting, canteen and

5    telephone privileges.  They attend the law library and religious services.  During a lockdown,

6    however, these programs are suspended and inmates are confined to their cells.  Inmate

7    movement is controlled, under close supervision, and under escort with mechanical restraints.

8            Pursuant to CDCR policies and procedures, whenever there is a serious incident

9    the initial incident response is as follows: the first priority is to isolate, contain and control the

10   situation to the smallest area possible.  Next is to provide medical attention for all injured

11   followed by the preservation of evidence.  Staff will then identify all involved persons and ensure

12   appropriate written documentation/reports are completed and submitted within designated time

13   frames.

14           Once the initial incident response is completed, assessment of the causes and

15   determination of program activity status begins.  Depending on the seriousness of the situation, it

16   may be necessary to modify or restrict program activities.  Available options are to modify

17   programs, lockdown, or declare a State of Emergency.  These options serve to restrict potentially

18   volatile persons or groups, and affords additional time to evaluate overall operations.

19           If it is determined that a lockdown is necessary, a program status report is

20   immediately developed to ensure both staff and inmates know what is expected.[2]  Maintaining

21   essential services, i.e. medical/mental health, hygiene, and access to courts are mandates.  The

22   plan is regularly reviewed and revised as scheduled activities are resumed.  Staff and inmates are

23

24           [2]  In his July 21, 2006, pleading, plaintiff states that he is objecting to the statement that
     "a program status report is immediately developed..."  Plaintiff state that he objects to this
25   statement "for the reasoning of the dispute not always inmates will level of a program status
     reports and what is expect."  The court does not understand the basis of plaintiff's objection.
26   Accordingly, the court finds this statement to be undisputed.

1   updated regularly.  The Facility Captain generally decides to institute a lockdown and makes the

2   recommendation to the Warden who approves or disapproves the recommendation.  Once a

3   lockdown is instituted, the Warden makes the decision when it is safe to unlock and return to

4   normal programming.

5          Following an incident that results in the decision to lockdown a facility, the

6   process of investigating and gathering intelligence begins.  This includes searches of all inmate

7   cells, common areas, dining halls, janitorial rooms and the outside yard.  Searching the outside

8   yard often consists of digging up the ground in search for weapons.  The purpose of these

9   searches is to uncover any weapons that will later be used to harm inmates or staff.

10         While it may take anywhere from 15 to 20 days to complete a search of a facility,

11  this time may be significantly extended if during the search critical information is discovered

12  necessitating further searches.   Defendants' undisputed fact no. 18 describes the investigation:

13         The investigation includes inmate interviews of all inmates in the facility.  This
           can be anywhere from 1000 to 1,100 inmates.  Staff are also interviewed.  The
14         purpose of the interviews is to gather intelligence for the purpose of identifying
           fomenters of violence and determining when it is safe to return to normal
15         programing.  The interview process may also be extended depending on the type
           of information obtained and the necessity for follow-up on leads.
16

17         Plaintiff objects that defendants did not produce any procedure of policy to

18  support the statements contained in undisputed fact no. 18.  Defendants are not required to

19  produce policy or procedure to support these statements.  Plaintiff has provided no policies or

20  procedures suggesting that the statements contained in undisputed fact no. 18 are false.  Plaintiff

21  also objects that defendants did not interview plaintiff during any investigation.  That plaintiff

22  may not have been interviewed would not change the fact that defendants' policy was to

23  interview all inmates.

24         Defendants' undisputed fact no. 19 describes other investigation techniques:

25         In addition, staff are communicating with other institutions as well as
           headquarters to compare the intelligence gathered and ensure that it is safe to
26         resume normal programing.  It is common to have staff at other institutions

9

1   interview inmates there as well as to monitor their mail and telephone
    communications.  The main priority is always the safety of inmates and staff while
2   working on a plan to unlock the facility.

3   Plaintiff objects that undisputed fact no. 19 does not set forth the time frame

4   during which the intelligence gathering occurs.  Defendants' failure to set forth the time frame

5   does not undermine the description of the investigation techniques.  This objection is without

6   merit.

7   It is the CDCR's policy to return to full normal programming as soon as it is safe

8   to do so.  Depending on the magnitude and dynamics of the incident, movement towards full

9   program activities will be made.  How a facility is unlocked depends greatly on the nature of the

10  incident and is determined on a case-by-case basis.  Movement back to full normal programming

11  is planned and occurs during normal business hours when the majority of regularly scheduled

12  staff are present and have been fully briefed on the plan of operation.

13  The task of releasing inmates to full normal programing is accomplished

14  incrementally beginning with small numbers of inmates and progressing to larger numbers as it is

15  determined that it is safe to do so.  Generally, critical workers are released first.  Additional

16  increases in numbers are accomplished by expanding the critical workers list and returning

17  inmates first to priority assignments.  As inmates are returned to work assignments, their

18  privileges are also restored incrementally.

19  The remaining and unassigned inmates are then included in releases for return to

20  full programing.  Generally, prisoners of ethnic or racial groups not involved in the incident are

21  released first, followed by non-involved groups (e.g., gang affiliations).  Inmates are released in

22  small groups to the dayroom or the recreation yard.  This provides staff an opportunity to observe

23  their conduct in a controlled setting.  During releases of these inmates, incremental positive

24  program activities are also scheduled for them such as telephone calls, canteen, or quarterly

25  packages.

26  \\\\\

Defendants undisputed fact no. 24 states, "There are times when during the unlock process, another incident will occur requiring those inmates who have begun the incremental release process to be locked down until an investigation of the incident can be completed."  In his July 21, 2006, pleading plaintiff objects that undisputed fact no. 24 is vague and ambiguous. Plaintiff's objection is without merit.

During a lockdown, there are daily briefings and mandatory weekly meetings with the Warden (or Chief Deputy Warden) to discuss the status of the lockdown.  The purpose of the weekly meetings is to report on the status of the lockdown, and continue to plan the resumption of normal programming as soon as possible.  The meetings focus on investigation updates to determine progress, review interview/intelligence results, and establish or revise the plan of operation.  The Warden may require more frequent meetings depending on the individual circumstances related to each lockdown.  Generally, the Warden or Chief Deputy Warden, Facility Captain, Associate Warden, Use of Force Coordinator and any other line staff member with relevant information will attend these meetings.

*January 2, 2002, Incident*

Defendant Vance was the Facility Captain over B Facility from September 2001 to September 2003.  On January 2, 2002, an inmate attempted to murder Officer Haggard.  As staff responded to the incident, eleven inmates joined in and attacked responding staff.  Inmate manufactured weapons were used in the attack.  Plaintiff was not involved in this incident and nor did he receive a rules violation report regarding it.

In undisputed fact no. 30, defendants state that three of the four officers were transported to the hospital for treatment for injuries, and that Officer Haggard was hospitalized in the intensive care unit.  Plaintiff objects that this fact is not supported by medical reports.  These facts are adequately supported by defendants' exhibit B and E and do not require submission of medical records.  Plaintiff's objection is without merit.  Accordingly, this fact is deemed undisputed.

1    During a subsequent search of the dining room by the investigative services unit,

2    staff discovered one inmate manufactured weapon secreted inside a milk carton on the fourth

3    dining room table from 4 block.  The weapon measured approximately 4 3/4 inches long by 3/4

4    inches in diameter.  It was constructed of a round metal rod, sharpened to a point at one end and

5    wrapped with tape and cellophane at the other.

6    A lockdown of Facility B was ordered and the decision approved by Warden

7    Pliler.  Defendants' undisputed fact no. 33 goes on to describe the conditions of a lockdown.

8    Plaintiff again objects that this description is inconsistent with the description of lockdowns in

9    Cal. Code Regs. tit. 15, § 3000.  The definition of lockdowns in § 3000 is not inconsistent with

10   the information contained in undisputed fact no. 10.  Accordingly, the court deems defendants'

11   fact no. 33, as described in the paragraph below, to be undisputed.

12   During a lockdown inmates are confined to their cells.  They are cell fed and are

13   allowed to exit their cells for controlled showers.  They are provided essential services such as

14   medical attention.  Inmates are not allowed to go to their assigned work or education programs.

15   They are not allowed to go to the yard because of the degree of danger which presents itself when

16   there are large numbers of inmates on a yard at the same time.

17   The first sentence of defendants' undisputed fact no. 34 states that pursuant to

18   CDCR policy and procedures, immediately following the lockdown an investigation was

19   commenced into the cause of the assault on staff.  While plaintiff objects that defendants did not

20   cite the CDCR policies and procedures relied on in support of this fact, he does not argue that the

21   investigation was not made pursuant to these policies and procedures.  Defendants' failure to cite

22   the relevant policies and procedures does not render this fact undisputed.  Accordingly, this

23   objection is without merit.

24   It was unknown at the time whether this was an isolated incident or whether there

25   were other possible planned attacks on staff.  Staff worked diligently to identify whether there

26   were other inmates who played a role in the attack on staff and have those inmates removed.

1    The first month following the incident was occupied with conducting searches,

2 interviewing inmates and staff, and gathering intelligence from various sources.  All of the

3 inmates on Facility B except for plaintiff were interviewed.  Whether or not plaintiff was

4 interviewed is a disputed fact.  Inmates refused to talk for fear of retaliation by other inmates.  As

5 a result, the information was slow in coming forward.

6    Additionally, staff had to conduct thorough searches of all inmate cells as well as

7 common areas.  During these searches, the main yard was dug up in search of weapons that could

8 have been buried.

9    Defendants' fact no. 37 provides,

10    Furthermore, during the process of investigating and gathering intelligence, staff
     were presented with information which raised more questions and concerns.
11    Because they could not be certain that this was an isolated incident, it was not safe
     to unlock or to begin the unlock process of restoring yard privileges to the inmate
12    population.

13    Plaintiff objects that defendants' fact no. 37 does not describe the information

14 which raised more questions and concerns.  This objection has merit.  Accordingly, fact no. 37 is

15 not adopted.

16    Also of great concern was the fact that the inmates who assaulted staff were

17 Southern Hispanics.  Defendants fact no. 38 goes on to describe their concern regarding this

18 prison gang: "The Southern Hispanics is the most influential, organized and dangerous prison

19 group.  Generally, attacks such as this one do not occur unless it has been approved by the

20 leaders of the group.  Because of this, it was believed that the Southern Hispanics had put a hit

21 out on staff."

22    Plaintiff objects that this description is conclusory and unsupported by any

23 evidence.  Defendants' description is contained in the declaration of Steve Vance.  Plaintiff does

24 not address why Steve Vance is not qualified to describe the concerns regarding this gang.

25 Accordingly, plaintiff's objection is without merit.

26 \\\\\

Defendants' fact no. 39 states, "There was a very serious and viable threat to staff safety that had to be fully investigated.  The threat level was the highest Mr. Vance had seen in his 22 year career with CDCR."  Defendants' fact no. 40 states, "Staff were also investigating the possibility that the attacks had been ordered by the Mexican Mafia at Pelican Bay State Prison. Staff were communicating with prison staff at Pelican Bay as well as other institutions and comparing information and verifying leads.  Inmates at Pelican Bay were also being interviewed in an attempt to gain information."

Plaintiff objects that defendants fact nos. 39 and 40 are vague, ambiguous, conclusory and not supported by the evidence.  Plaintiff's objections are without merit.

Defendants' fact no. 41 states, "Inmates in the other facilities at CSP-Sacramento were also being interviewed, as well as those in Administrative Segregation.  Staff were reading inmate mail in search of information.  Notes were also being passed by inmates to staff with information which had to be verified."

Plaintiff objects that defendants did not submit any documentary evidence in support of fact no. 41.  Fact no. 41 is adequately supported and is based on information contained in the declaration of Steve Vance, defendants' Exhibit B.  Defendants are not required to submit documentary evidence in support of fact no. 41 because Vance has personal knowledge of these facts.  Accordingly, this objection is without merit.

As a result, during the initial phase of the investigation, the inmates in B Facility were not permitted to return to their regular program activities, including daily yard exercise, until all involved inmates could be identified and removed from the general population and all searches for weapons were completed.  Mr. Vance and other custodial staff responsible for B Facility concluded that until the investigation was complete and all involved inmates could be identified and removed from the general population in B Facility, release of prisoners to the main exercise yard posed an unacceptable risk of renewed violence that threatened the safety of inmates and staff.

1    Defendants fact no. 43 states,

2    Between January 4, 2002, and March 8, 2002, through interviews and searches,
     staff continued to obtain information, which indicated that there was a serious and
3    viable threat to institutional safety.  While the goal was to return to normal
     programming, Mr. Vance's first priority was to ensure the safety of staff and
4    inmates.  Due to the nature of the information that was being revealed through the
     investigation process, and staff's responsibility to follow all leads, it was not safe
5    to begin the process of releasing inmates.

6    Plaintiff objects that this fact is vague and ambiguous because it does not describe

7    the information which led staff to believe that a continuing threat existed.  This objection is

8    valid.  Accordingly, defendants' fact no. 43 is not adopted.

9    Defendants fact no. 44 states that,

10   Also, on February 22, 2002, there was another attempted murder of a peace officer
     by inmates in C Facility.  This incident occurred only one day after C Facility
11   began the process of unlocking that facility.  While this incident occurred in a
     different facility, it affected both A Facility and B Facility because of the nature of
12   the assault on staff and the fact that there existed a viable threat against staff
     members.
13

14   Plaintiff objects that defendants failed to submit a report from the February 22,

15   2002, incident.  Plaintiff also objects that the incident is not relevant.  Fact no. 44 is based on

16   information contained in the declaration of Steve Vance, who has personal knowledge of this

17   incident.  Defendants' Exhibit B.  For this reason, and because the information is relevant,

18   plaintiff's objection to fact no. 44 is without merit.

19   Defendants fact no. 45 states,

20   On March 8, 2002, staff began the process of releasing inmates in B Facility to
     normal programming.  Pursuant to CDCR policy, the critical workers were
21   released first by giving them the opportunity to go to the yard for exercise on
     Saturdays and Sundays, and restoring various other programs and privileges to
22   this group.  This group consisted of approximately 95 inmates.  This allowed staff
     to observe these inmates in relatively small numbers.  On March 14, 2002, about
23   35 critical workers were added to the group.

24   Plaintiff objects as follows: "Disputed absent CDCR meaning of the term normal

25   program." This objection is meritless.  Accordingly, this fact is deemed undisputed.

26   \\\\\

1    Defendants' fact no. 46 states, "On March 27, 2002, the critical worker's list was

2 augmented to include approximately 210 workers, including Norwood." Plaintiff objects that

3 defendants failed to provide any evidence supporting this number of workers released. This

4 information is taken from the declaration of Steve Vance, defendants' Exhibit B, who has

5 personal knowledge of these matters. Accordingly, plaintiff's objection is without merit and this

6 fact is deemed undisputed.

7    Defendants' fact no. 47 provides, "Other groups of inmates were incrementally

8 added to the list of inmates to be released. By April 3, 2002, all non-Hispanic inmates in B

9 Facility were allowed to go to the yard for exercise according to an approved yard schedule."

10 Plaintiff states that he disputes the second sentence of fact no. 47, but does not state the grounds

11 of this objection. Accordingly, fact no. 47 is deemed undisputed.

12    In his June 26, 2006, pleading, plaintiff disputes defendants' claim that he was

13 released from lockdown by April 3, 2002, i.e. approximately 90 days after it was imposed.

14 Plaintiff argues that the lockdown lasted for 120 days. Plaintiff cites no evidence to support this

15 claim. Accordingly, the court finds that it is undisputed that plaintiff was on lockdown for

16 approximately 90 days following January 4, 2002.

17    Defendants' fact no. 48 provides, "On April 15, 2002, a stabbing/slashing assault

18 occurred on the main exercise yard involving White inmates. This incident delayed efforts to

19 resume normal program, however, staff continued to work diligently in doing so." Plaintiff

20 objects that defendants' evidence does not support this fact. Fact no. 48 is contained in the

21 declaration of Steve Vance. Plaintiff does not allege that Vance does not have personal

22 knowledge of these facts. Accordingly, this objection is without merit and this fact is deemed

23 undisputed.

24    The entire time, weekly meetings with the Warden, Associate Warden, Facility

25 Captain, Use of Force Coordinator and other critical staff members were taking place to discuss

26 the progress made and the status of the lockdown.

*May 8, 2002, Incident*

On May 8, 2002, while still in the process of resuming a full normal program in Facility B, Officer Tuter was attacked by a Black inmate with an inmate manufactured weapon. The inmate attacked officer Tuter by striking him repeatedly in the head with a weapon.  The weapon was four and one-half inches long, a half-inch wide, a quarter inch thick, and appeared to have been fashioned from a toothbrush.  Plaintiff was not involved in this incident and nor did he receive a rules violation report regarding it.

Defendants' fact no. 51 provides,

> As a result of the attack on Officer Tuter, as well as the prior January 4, 2002, attack on other staff members, and the April 15, 2002, stabbing/slashing assault by White inmates, Mr. Vance ordered a lockdown of all inmates in B Facility.  The decision was approved by Terry Rosario who was the acting Warden at that time.

Plaintiff objects that the reference to the April 15, 2002, incident is not relevant. The April 15, 2002, incident is relevant.  Accordingly, fact no. 51 is undisputed as plaintiff's objection is without merit.

All programs were suspended, including the use of the yard for recreation purposes.

Pursuant to CDCR policy and procedures, immediately following the lockdown an investigation was commenced into the cause of the attack of officer Tuter.  This included a search of all cells and common areas, interviews with all inmates and staff and gathering of intelligence information from other sources.

Defendants fact no. 54 states, "Inmates were not talking and the information was slow in coming forward."  Plaintiff objects that this fact is not supported by admissible evidence. This statement is taken from Steve Vance's declaration, defendants' exhibit B.  Plaintiff does not claim that Steve Vance does not have personal knowledge of these facts.  Accordingly, fact no. 54 is deemed undisputed as plaintiff's objection is without merit.

\\\\\

By July 1, 2002, some of the privileges were being restored to inmates such as visiting, canteen, packages, and telephone access.  On July 11, 2002, Southern Hispanics and Mexican Nationals were allowed to use the small concrete yards for recreation in groups of up to 16 inmates per yard.  The Whites, American Indians, others[3] and critical workers were released to the main yard in groups of up to 50 at a time.  By July 16, 2002, Southern Hispanics were released to the small concrete yards in groups of up to 20 inmates.  Whites, American Indians, Mexican Nationals and others were released to the main yard in groups of up to 100 inmates.  By July 31, 2002, Blacks were released to the small concrete yard in groups of up to 20 inmates and all other inmates were normal with a maximum of 150 inmates on the main yard at a time.

Defendants fact no. 56 states,

> Over the course of the next few months, staff continued to work towards resuming a full normal program in all respects.  On occasion, they experienced some set backs resulting in temporarily suspending yard and privileges at various times due to threats on staff and inmate safety, or based on information received indicating there was a threat of violence.  Nonetheless, Mr. Vance and other staff continued to work towards the goal of resuming a full normal program.

Plaintiff objects that fact no. 56 does not describe the set backs that resulted in the temporary suspension of yard and privileges.  This objection has merit.  Accordingly, this portion of fact no. 56 is not undisputed.

The entire time, meetings with the Warden, Associate Warden, Facility Captain, Use of Force Coordinator and other critical staff members were taking place to discuss the progress made and the status of the lockdown.  The meetings were taking place at least twice a week.

*December 28, 2002, Incident*

Defendants' fact no. 58 states,

> On December 28, 2002, a riot occurred on the B Facility main exercise yard where a large number of Black inmates attacked and physically assaulted staff.  The

---

[3]  The classification of "other" is given to the Asian and Pacific Islander group of inmates.

18

attack began when Sergeant Murphy observed two inmates engaged in what appeared to be a fistfight on the facility B main exercise yard.  Sergeant Murphy ordered the two inmates to stop and get down, but they did not comply.  Sergeant Murphy instructed the central tower officer to order the yard down.  Sergeant Murphy used his O.C. Pepper Spray on the two inmates and they immediately got down on the ground.  Sergeant Murphy was then attacked by another inmate.  At the same time, numerous other inmates got up and ran towards Sergeant Murphy and attacked him.  Sergeant Murphy was forced to the ground and five inmates proceeded to jump on him and strike him.

Plaintiff objects that fact no. 58 is based on exhibit H, the objected to Crime/Incident Report discussed above.  Plaintiff argues that Exhibit H violates the Best Evidence Rule.  This objection is without merit.  Accordingly, fact no. 58 is deemed undisputed.

Plaintiff was not involved in the December 28, 2002, incident and nor did he receive a rules violation report regarding it.

Defendants' fact no. 59 states, "As other staff members responded to the yard, inmates got up from the prone position and attacked the responding staff.  Many of the inmates had inmate manufactured weapons.  In total, six inmate manufactured weapons were recovered."  Plaintiff objects that the information contained in fact no. 59 is immaterial to the case.  This objection does not render this fact undisputed.

Defendants' fact no. 60 states,

Based on subsequent staff interviews and reports, it was determined that the fist fight between the two inmates was a diversion for the purpose of distracting and attacking staff.  Further investigation and review of the videotapes of the incident identified at least 24 inmates as active participants on the staff assaults.

Plaintiff objects to "the nature of the melee and detail facts as non-involved parties is irrelevant and assume as fact."  Plaintiff's objection is without merit.  Accordingly, fact no. 60 is deemed undisputed.

Defendants' fact no. 61 states, "Nine staff members sustained injuries as a result of the incident."  Plaintiff objects that fact no. 61 assumes facts not in evidence.  Plaintiff's objection is without merit.  Accordingly, fact no. 61 is deemed undisputed.

\\\\\\

Defendants' fact no. 62 states, "At the time of this incident, B Facility was still in the process of unlocking and resuming a full normal program.  This incident, coupled with numerous other incidents of violence between the inmates, led to Mr. Vance instituting a full lockdown again."   Plaintiff objects that fact no. 62 does not describe the "numerous other incidents of violence" that led Mr. Vance to institute a full lockdown.  Defendants' fact no. 63-65 describe the other incidents of violence.  Accordingly, this objection is without merit.

Defendants' facts nos. 63-65 state as follows:

63.  The other incidents of violence included an incident on August 22, 2002, on the B Facility 7 block and 2 block mini concrete yards involving White and Hispanic inmates, where numerous inmates received serious injuries.  Subsequent to this incident, numerous inmate manufactured weapons were discovered in possession of the White and Southern Hispanic inmates.

64.  Also, on October 3, 2002, during the unlock process, another incident occurred on the B Facility main yard involving White and Hispanic inmates which also resulted in several inmates receiving serious injuries.  Again, numerous inmate manufactured weapons were discovered in possession of the White and Southern Hispanic inmates.

65.  On December 15, 2002, during evening showers, another incident occurred involving White and Hispanic inmates resulting in an inmate receiving serious injuries.

Plaintiff objects that defendants' facts nos. 63-65 are not supported by the evidence and are irrelevant.  The information contained in these facts is taken from the declaration of Steve Vance, defendants' exhibit B.  The information is also relevant.  Because plaintiff's objections are without merit, defendants' facts nos. 63-65 are deemed undisputed.

An investigation into the December 28, 2002, attack on staff was immediately commenced.  This included a search of all cells and common areas, interviews with all inmates and staff and gathering of intelligence and information from other sources.

Defendants' fact no. 67 provides,

Over the course of the next several months, staff continued to work towards resuming a full normal program in all respects, encountering set backs in the process.  On February 16, 2003, an incident occurred in B Facility 4 block involving White inmates and the use of a deadly weapon, causing a delay in staff's efforts to unlock the facility.  Nonetheless, Mr. Vance and his staff

1     continued to work towards the goal of resuming a full normal program.

2          Plaintiff objects to fact no. 67: "Plaintiff object to non-involved parties

3  misconduct as irrelevant to the present case and presume facts no support by the record.  On

4  February 16, 2003, an incident occurred.  Disputed."  The court does not understand the first part

5  of plaintiff's objection.  While plaintiff states that he disputes that an incident occurred on

6  February 16, 2003, plaintiff does not otherwise describe his objection.  It is unclear, for example,

7  if plaintiff is claiming that no incident occurred on that date.  Accordingly, the court finds that

8  plaintiff's objections to fact no. 67 are meritless.  This fact is deemed undisputed.

9          Defendants' fact no. 68 states, "By February 21, 2003, the process of unlocking B

10  Facility began.  Staff started by releasing a small number of uninvolved inmates first and

11  observing their behavior prior to adding to the groups.  On March 18, 2003, they began releasing

12  the Whites and Hispanics to the small concrete yard in small groups."  Plaintiff's objection to

13  fact no. 68 states as follows:  "Disputed.  Sgt. Swancy and Mr Vance response on April 21,

14  2003, stating African Americans will remain on lockdown."  In support of this statement,

15  plaintiff cites his exhibits G, p. 31, and D, attached to his summary judgment motion.  The court

16  has reviewed these exhibits and finds that they do not support plaintiff's claim.  However, fact

17  no. 68 does not specifically address when African American inmates were to be released.

18  Accordingly, the court finds that the information contained in fact no. 68, which contains dates

19  regarding when White and Hispanic inmates were released from lockdown, is undisputed.

20          Defendants' fact no. 69 states,

21          Staff continued to encounter set backs.  On May 5, 2003, there were two separate
            stabbing assaults involving White inmates in which both victims sustained serious
22          injuries.  On June 1, 2003, there was a slashing incident involving White inmates.
            Staff, however, continued moving forward with the plan to incrementally unlock
23          the facility.

24          Plaintiff objects that fact no. 69 contains "immaterial evidence" and does not

25  "support the evidence."  Plaintiff's objection is without merit.  Accordingly, fact no. 69 is

26  deemed undisputed.

By May 15, 2003, Asians and American Indians were released to the yard on a normal schedule.  Hispanics were released to the small cement yards.

In undisputed fact no. 70, defendants state that Black inmates were released to the small cement yards on a rotating schedule on or before May 15, 2003.  In his June 26, 2006, pleading, plaintiff claims that the December 28, 2002, lockdown lasted for 180 days, i.e. until June 26, 2003.  In support of this claim, plaintiff cites exhibit D attached to his motion for partial summary judgment.  Attached to exhibit D is a memorandum addressed to plaintiff dated June 4, 2003, from Warden Pliler.  This memorandum states that it is in response to plaintiff's letter dated February 12, 2003, regarding his allegations of unfair race based lockdowns.  This memorandum does not indicate that plaintiff was still on lockdown at the time it was prepared.  Plaintiff has cited several other exhibits in support of his claim that the lockdown lasted into June 2003.  The court has reviewed these exhibits and does not find that they support plaintiff's claim.  Accordingly, the court finds that plaintiff was released from the December 2002 lockdown by May 15, 2003.

As with all other lockdown situations, weekly meetings with the Warden Associate Warden, Facility Captain, Use of Force Coordinator and other critical staff members were taking place to discuss the progress made and the status of the lockdown.  These meetings were taking place more often than once a week.

Defendants' facts nos. 72 and 73 state as follows:

72.  On September 3, 2003, Officer Curry was brutally attacked by an inmate with an inmate manufactured weapon (metal can lid).  Officer Curry was slashed numerous times in the face and neck areas, punched in the nose, and flung down the stairs by the inmate.

73.  Because of the unusually high number of recent staff assaults, a State of Emergency was declared by the Director of the CDCR.  A State of Emergency can only be declared by the Director.  During a State of Emergency, the Warden may authorize the postponement of nonessential administrative decisions, actions, and the normal time requirements for such decisions and actions as deemed necessary because of the emergency.  This may include, but is not limited to, classification committee hearings, disciplinary proceedings, and the review and action on inmate appeals.

1        Facts nos. 72 and 73 concern the lockdown and State of Emergency declared

2   following the attack on Officer Curry in September 2003.  Plaintiff's amended complaint

3   contains no claims regarding this lockdown.  Accordingly, facts nos. 72 and 73 are disregarded.

4        Plaintiff's undisputed facts nos. 5, 10 and 12 cite administrative appeals as

5   evidence that the December 2002 lockdown was improperly racially motivated:

6            5. On June 4, 2003, Warden Pliler responded to Plaintiff letter to Russ Heimerich
             that the African Americans on B-Facility were going to remain on lockdown.
7            Although plaintiff were not involved. Ex. 'D', p. 27. The administration at CSP-
             SAC is aware that the loss program activities as a result creates a hardship to all
8            effected inmates.

9            10. On April 21, 2003, Appeal Log No. SAC-B-03-00983 was denied by J.
             Swaney and conceded that all African Americans will remain on lockdown,
10           affirming plaintiff was being punished on his ethnicity.  With the approval of
             Captain Vance. Ex. "G", p. 31, 34.
11
12           12. May 2003, multiple complaints were register before Warden Pliler that
             plaintiff among other prisoners was encountering discrimination problems on B-
13           Facility at CSP-SAC IV, and was requesting equal treatment under the Equal
             Protection Clause of the Fourteenth Amendment rights. Ex. "I", p. 38-47. Letters
             responses to (4) four prisoners by Warden Pliler office.  That she was aware their
14           ethnicity were deliberately target in regards to the lockdown.

15       Fact no. 5 is not evidence that the December 2002 lockdown was improperly

16   racially motivated.

17       As to fact no. 10, the court has reviewed the exhibit cited by plaintiff in support of

18   this claim.  Page 34 of plaintiff's Exhibit G is a response to plaintiff's administrative appeal

19   challenging the December 2002 lockdown.  Plaintiff alleges in the appeal that to hold him and

20   other African American inmates not involved in the December 2002 incident on lockdown

21   constituted racial discrimination.  The response to the appeal states, in relevant part, "The current

22   Lockdown in B-Facility is due to several African American inmates assaulting staff and pending

23   the investigation and until the safety of staff can be ensured all African American inmates will

24   remain on lockdown."  This document demonstrates that all African American inmates were held

25   on lockdown following the December 2002 incident, but not that it was improperly racially

26   motivated.  Accordingly, plaintiff's undisputed fact no. 10 is disregarded.

1    As to fact no. 12, exhibit I includes responses to appeals filed by plaintiff alleging

2    that the December 2002 lockdown was racially motivated.  In the responses, Warden Pliler

3    acknowledges that she received appeals alleging that the lockdown was improperly racially

4    motivated.  Warden Pliler did not state that the lockdowns were, in fact, improperly racially

5    motivated.  Accordingly, plaintiff's undisputed fact no. 12 is disregarded.

6    B.  Equal Protection

7    Plaintiff argues that defendants violated his right to Equal Protection by placing

8    all African American inmates on lockdown when only a few African Americans engaged in

9    misconduct.  Plaintiff is suggesting that defendants used the misconduct of a few African

10   American inmates to improperly justify the lockdown of all African American inmates.

11   As discussed above, defendants argue that they are entitled to qualified immunity

12   as to plaintiff's Equal Protection claim.  The determination of whether a prison official is entitled

13   to qualified immunity is a two-step test.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151

14   (2001).  In the first step, the court views the record in the light most favorable to the party

15   asserting injury to determine whether the officer's conduct violated a constitutional right.  Id.  If

16   the plaintiff establishes the violation of a constitutional right, the court next considers whether

17   that right was clearly established at the time the alleged violation occurred.  Id.  The contours of

18   the right must have been clear enough that a reasonable officer would have understood that what

19   he was doing violated that right.  See Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034

20   (1987).

21   "The Equal Protection Clause of the Fourteenth Amendment commands that no

22   State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

23   essentially a direction that all persons similarly situated should be treated alike."  City of

24   Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985) (quoting Plyler v.

25   Doe, 457 U.S. 202, 216, 102 S.Ct. 2382 (1982)).  When challenging his treatment with regard to

26   other prisoners, a prisoner must show that his treatment is invidiously dissimilar to that received

by other inmates.  A prison classification based on race is immediately suspect and is subject to the same strict scrutiny as a racial classification outside prison; prison officials must therefore demonstrate that the race-based policy or action is narrowly tailored to serve a compelling state interest.  Johnson v. California, 543 U.S. 499, 125 S.Ct. 1141, 1148-49 (2005).

The court will separately analyze each of the three at-issue lockdowns.  The January 2, 2002, lockdown was imposed as a result of an assault on staff by Southern Hispanic inmates.  This lockdown was imposed on all inmates in Facility B, regardless of race.  The first inmates released from the lockdown on March 27, 2002, were critical workers – a non race-based class of inmates.  By April 3, 2002, all non-Hispanic inmates were allowed to go to the yard.  Efforts to resume normal programming were delayed due to a stabbing incident on the main exercise yard involving white inmates on April 15, 2002.

Because all inmates were placed on lockdown following the January 2, 2002, incident, plaintiff's claim that African American inmates discriminated against during this time must fail.   African American inmates were allowed to go to the yard at the same time as the other non-Hispanic inmates.  There is no evidence that African American inmates were treated differently by defendants in their further attempts to resume normal programming.  Accordingly, defendants are entitled to summary judgment as to plaintiff's Equal Protection claim based on the January 2, 2002, lockdown because there is no evidence of discrimination against African American inmates.

The May 8, 2002, lockdown was imposed as a result of the stabbing of prison staff by an African American inmate.  Following this incident, all inmates in Facility B were placed on lockdown.  On July 11, 2002, Southern Hispanics and Mexican Nationals were allowed to use small concrete exercise yards.  White, American Indian, Asian and Pacific Islander and critical workers were released to the main yard on July 11, 2002.  Southern Hispanic inmates were released to small concrete yards by July 16, 2002.  African American inmates were released to small concrete yards by July 31, 2002.  There is no evidence that African American inmates were

1    treated differently by defendants in their further attempts to resume normal programming.

2         The May 8, 2002, lockdown was imposed on all inmates.  However, African

3    American inmates were released from the lockdown approximately two weeks later than the

4    other inmates.  No evidence in the record specifically addresses why African American inmates

5    were not released from the lockdown at the same time as the other inmates.  While defendants

6    have a policy of first releasing from lockdown inmates of ethnic or racial groups not involved in

7    the incident, it is not clear from the evidence how this policy is narrowly tailored to serve a

8    compelling state interest.  Accordingly, the court cannot find that the release of African

9    American inmates later than the other inmates did not violate plaintiff's constitutional rights.

10        Thus, from an injunctive relief standpoint, defendant's motion for summary

11   judgment must be denied.  However, from a damages standpoint, the doctrine of qualified

12   immunity must be explored.

13        With respect to the May 8, 2002, lockdown, the court turns to the second prong of

14   the qualified immunity analysis: whether plaintiff's right to be free from race-based lockdowns

15   was clearly established, and, if so, whether a reasonable prison official would have understood

16   that his conduct was clearly unlawful.

17        In Walker v. Gomez, 370 F.3d 969 (9th Cir. 2004) an African American inmate

18   alleged that prison officials violated his right to equal protection because during three lockdowns

19   in 1995 he was not allowed to resume his prison job until after similarly situated inmates of other

20   races.  The Ninth Circuit found that defendants were entitled to qualified immunity because it

21   had not been clearly established that such race based differentiation was unconstitutional in the

22   context of a prison-wide lockdown instituted in response to gang or race based violence:

23        Walker has not brought to our attention, and our independent research does not
          reveal, case law involving the particular circumstances presented by this case.  The
24        second prong of the Saucier inquiry operates at a high level of specificity.  It is
          insufficient that the broad principle underlying a right is well-established.  "The relevant,
25        dispositive inquiry in determining whether a right is clearly established is whether it
          would be clear to a reasonable officer that his conduct was unlawful in the situation he
26        confronted."  Saucier, 533 U.S. at 202, 121 S.Ct. 2151.  While it is well established that

26

1    racial discrimination in the assignment of prison jobs is unconstitutional, cf. Black, 824
2    F.2d at 562; Foster v. Wyrick, 823 F.2d 218, 220 (8th Cir. 1987), it has not been clearly
    established that such race-based differentiation is unconstitutional in the context of a
    prison-wide lockdown instituted in response to gang–or race–based violence.  Defendants
3    are therefore entitled to qualified immunity.

4    Walker, 370 F.3d at 977-978.

5            In 2002, it was also not clearly established that race-based differentiation was

6    unconstitutional in terms of when inmates were released to the exercise yard in the context of a

7    prison wide lockdown instituted in response to gang or race based violence.  Defendants'

8    decision to release the African American inmates to the exercise yard approximately two weeks

9    after the other inmates based on a lockdown imposed as a result of misconduct by an African

10    American inmate did not violate clearly established law.  Accordingly, defendants are entitled to

11    qualified immunity as to this claim.

12            The December 28, 2002, lockdown was imposed after a riot by African American

13    inmates.  Following this incident, all inmates on Facility B were placed on lockdown.  On March

14    18, 2003, White and Hispanic inmates were released to small yards.  On May 15, 2003, Asian,

15    American Indian and African American inmates were released to the yard on normal schedule.

16    There is no evidence that African American inmates were treated differently by defendants in

17    their further attempts to resume normal programming.  Therefore, plaintiff's only Equal

18    Protection claim is that African American inmates were discriminated against because they were

19    not released to the exercise yard at the same time as the White and Hispanic inmates, i.e. on

20    March 18, 2003.

21            Again, no evidence in the record specifically addresses why African American

22    inmates were not released from the lockdown at the same time as the other inmates.  While

23    defendants have a policy of first releasing from lockdown inmates of ethnic or racial groups not

24    involved in the incident, and such a policy has some logic associates with it, i.e., it may take

25    longer to clear a group some of whose individuals have gang connections, it is not clear from the

26    evidence how this policy is narrowly tailored to serve a compelling state interest.  Accordingly,

1    the court cannot find that the release of African American inmates later than the other inmates

2    did not violate plaintiff's constitutional rights.  Injunctive relief might be appropriate.

3            For the reasons discussed with respect to the May 8, 2002, lockdown, the court

4    finds that defendants are entitled to qualified immunity.  In 2003, the law was not clearly

5    established that race-based differentiation was unconstitutional in terms of when inmates were

6    released to the exercise yard in the context of a prison wide lockdown instituted in response to

7    gang or race based violence.

8            For the reasons discussed above, the court recommends that defendants be granted

9    summary judgment as to plaintiff's Equal Protection claim.

10           C.  Exercise

11           Defendants move for summary judgment as to plaintiff's exercise claim on

12   grounds that they are entitled to qualified immunity.  Accordingly, the court begins the qualified

13   immunity analysis by determining whether defendants violated plaintiff's constitutional rights.

14           The deprivation of outdoor exercise by prison officials to prisoners can constitute

15   cruel and unusual punishment in violation of the Eighth Amendment.  Spain v. Procunier, 600

16   F.2d 189 (9th Cir. 1979).  "[S]ome form of regular outdoor exercise is extremely important to the

17   psychological and physical well being of the inmates."  Id. at 199.  The long term deprivation of

18   exercise is a denial of a basic need in violation of the Eighth Amendment.  Allen v. Sakai, 48

19   F.3d 1082, 1088 (9th Cir. 1994).  Regular outdoor exercise is necessary "unless inclement

20   weather, unusual circumstances, or disciplinary needs make that impossible."  Id.  In Hayward v.

21   Procunier, 629 F.2d 599, 603 (9th Cir. 1980) the Ninth Circuit found that the deprivation of

22   outdoor exercise and five month lockdown in response to a genuine emergency did not violate

23   the Eighth Amendment.

24           The court will separately analyze each of the at-issue lockdowns.  Plaintiff was

25   first on lockdown and denied outdoor exercise from January 2, 2002, to April 3, 2002, i.e. for

26   approximately three months.  The attempted murder of Officer Haggard and attack on the other

28

1  prison staff on January 2, 2002, clearly justified the initial decision to impose the lockdown.  It is

2  undisputed that following this incident, searches and interviews of inmates were conducted.

3  However, the record contains no specific evidence regarding why it was determined that the

4  emergency which justified the lockdown in the first place no longer existed on April 3, 2002.

5  Rather, the undisputed facts only generally provide that interviews and searches occurred.

6  Because defendants have not provided evidence specifically demonstrating that the security

7  emergency existed until April 3, 2002, the court does not find that they have met their initial

8  burden of demonstrating the absence of a genuine issue as to this material fact.

9          Plaintiff was on lockdown next from May 8, 2002, to July 31, 2002, i.e. for almost

10  three months.  The attack on Officer Tuter and the previous incidents of violence in Facility B

11  clearly justified the initial decision to impose the lockdown.  Again, it is undisputed that

12  following the attack on Officer Tuter searches and interviews of inmates were conducted.

13  However, the record contains no specific evidence regarding why it was determined that the

14  emergency which justified the lockdown in the first place no longer existed on July 31, 2002,

15  when African American inmates were released to small concrete yards.  Because defendants have

16  not provided evidence specifically demonstrating that the security emergency existed until July

17  31, 2002, the court does not find that they have met their initial burden of demonstrating the

18  absence of a genuine issue as to this material fact.

19          Finally, plaintiff was on lockdown from December 28, 2002, to May 15, 2003, i.e.

20  approximately 4 ½ months.  The December 28, 2002, riot clearly justified the initial decision to

21  impose the lockdown.  Again, it is undisputed that following the riot, searches and interviews of

22  inmates were conducted.  However, the record contains no specific evidence regarding why it

23  was determined that the emergency which justified the lockdown in the first place no longer

24  existed on May 15, 2003, when African American inmates were allowed to use small concrete

25  yards.  In other words, the record contains no specific evidence regarding why African American

26  inmates were not permitted outdoor exercise sooner.  Because defendants have not provided

evidence specifically demonstrating that the security emergency existed until May 15, 2003, the court does not find that they have met their initial burden of demonstrating the absence of a genuine issue as to this material fact.

As discussed above, defendants have not demonstrated that they did not violate plaintiff's constitutional rights. Assuming that defendants violated plaintiff's constitutional rights by depriving him of outdoor exercise for the periods of time discussed above, the next step of the qualified immunity analysis is to determine whether plaintiff's right to exercise was clearly established and whether a reasonable prison official would have understood that to deprive him of exercise was unconstitutional.

At the time of the alleged deprivations, it was clearly established that inmates had a constitutional right to outdoor exercise. Spain v. Procunier, 600 F.2d 198 (9th Cir. 1979). It was also clearly established that denying inmates outdoor exercise for the times at issue in this action was constitutional if a genuine emergency existed. Hayward v. Procunier, 629 F.2d 599 (9th Cir. 1980).

The issue is whether a reasonable prison official would have understood that depriving plaintiff of outdoor exercise during the at issue times violated his constitutional rights. As discussed above, the record as to all three lockdowns is not clear as to when the emergency ceased to exist. While it is clear that investigations had to be conducted, the record contains no specific evidence regarding when it was determined that it was safe to release African American inmates to the exercise yards. The record contains no evidence regarding why African African inmates were released to the exercise yards after inmates of other races, at least with respect to the May 8, 2002, and December 28, 2002, lockdowns. Without this information, the court cannot determine whether a reasonable officer would have known that denying plaintiff outdoor exercise was unconstitutional. Accordingly, defendants are not entitled summary judgment based on qualified immunity as to plaintiff's Eighth Amendment claim alleging a denial of outdoor exercise.

1          D.  Visitation

2          Defendants argue that they are entitled to summary judgment as to plaintiff's

3 claim alleging denial of the right to visits based on qualified immunity.  Accordingly, the court

4 first considers whether defendants violated plaintiff's constitutional rights by denying him visits

5 during the lockdowns.

6          It appears that plaintiff was permitted no visits while on lockdown – contact or

7 non-contact.  Inmates have no constitutionally protected right to contact visits.  Barnett v.

8 Centoni, 31 F.3d 813, 917 (9th Cir. 1994).  There is much doubt that visitation of any sort is

9 constitutionally protected, see Bazzetta v. McGinnis, 430 F.3d 795 (6th Cir. 2005) after remand

10 from Overton v. Bazzetta, 539 U.S. 126, 131-132, 123 S.Ct. 2162, 2167-68 (2003).

11          Certainly, given that plaintiff could only establish a very unclear constitutional

12 right to contact visitation, at best, defendants would be entitled to qualified immunity for any

13 alleged procedural due process violation accruing from over lengthy denial of such visits.

14 Defendants are entitled to summary judgment on this damages claim.  However, the injunctive

15 relief claim will be decided at trial upon further briefing.

16 IV.  Claim Challenging Ban on Materials Containing Frontal Nudity

17          Plaintiff challenges a policy of the California Department of Corrections and

18 Rehabilitation (CDCR) prohibiting inmates from possessing or receiving materials that show

19 frontal nudity of either gender.  In his verified second amended complaint, plaintiff alleges that

20 he was not allowed to possess or receive pictures of his wife containing frontal nudity.  Plaintiff

21 also alleges that he was not allowed to receive a publication containing frontal nudity.

22 Defendants dispute that the publications plaintiff sought to receive, Stuff and Maxim magazines,

23 contain frontal nudity.  However, defendants do not dispute that plaintiff was not allowed to

24 possess or receive pictures of his wife.

25          Defendants move for summary judgment as to this claim on grounds that they are

26 entitled to qualified immunity.  Accordingly, the court first considers whether the ban violated

1    plaintiff's constitutional rights.  In Mauro v. Arpaio, 188 F.3d 1054 (9th Cir. 1999) the Ninth

2    Circuit upheld a ban on publications containing frontal nudity by the Maricopa County Jail.  The

3    Ninth Circuit applied the four Turner factors, set forth above, in determining whether the ban on

4    these publications was rationally related to a legitimate penological interest.  188 F.3d at 1057.

5         In the instant case, defendants argue, in essence, that because the Maricopa

6    County Jail regulation satisfied the Turner factors, the CDCR regulation does as well.

7    Defendants submit no evidence supporting this claim.

8         In order for this court to be able to uphold the CDCR regulation banning frontal

9    nudity, defendants must provide evidence demonstrating that publications banning frontal nudity

10   caused security concerns in the first place.  While this point may seem obvious, the court cannot

11   make this finding on summary judgment without some evidence from defendants to back it up.

12   Accordingly, the court cannot find that the CDCR regulation is constitutional.

13        Assuming that plaintiff's right to possess and receive materials containing frontal

14   nudity was clearly established, the court considers whether a reasonable prison official would

15   have understood that denying plaintiff access to these materials violated that right.  In 1999, the

16   Ninth Circuit decided Mauro v. Arpaio, upholding a regulation very similar, if not identical, to

17   the at issue regulation.  The record in this case demonstrates that defendants denied plaintiff

18   access to materials containing frontal nudity after the time Mauro v. Arpaio was decided.  Based

19   on the Ninth Circuit's decision in that case, the court finds that a reasonable prison official would

20   not have believed that he was violating plaintiff's constitutional rights by denying access to

21   materials containing frontal nudity.  Rather, a reasonable prison official would have believed that

22   his actions were in conformity with Mauro v. Arpaio.  For this reason, the court finds that

23   defendants are entitled to qualified immunity with respect to this claim.

24   \\\\\

25   \\\\\

26   \\\\\

1    Accordingly, IT IS HEREBY RECOMMENDED that:

2        1.  Plaintiff's April 19, 2006, motion for partial summary judgment be denied;

3        2.  Defendants' April 14, 2006, motion for partial summary judgment be granted

4    as to plaintiff's damages claim challenging the ban on access to non-contact visits and

5    publications containing frontal nudity; defendants' motion be denied as to plaintiff's damages

6    claim challenging the denial of exercise; defendants' motion be denied as to plaintiff's injunctive

7    relief claim challenging the denial of exercise and contact visits;

8        3.  Defendants' May 10, 2006, opposition, construed as a motion for partial

9    summary judgment as to plaintiff's Equal Protection claim, be granted as to damages claims, but

10   be denied as to injunctive relief based upon the May 8, 2002 and December 28, 2002 incidents.

11       These findings and recommendations are submitted to the United States District

12   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

13   days after being served with these findings and recommendations, any party may file written

14   objections with the court and serve a copy on all parties.  Such a document should be captioned

15   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16   shall be served and filed within ten days after service of the objections.  The parties are advised

17   that failure to file objections within the specified time may waive the right to appeal the District

18   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19   DATED:   1/8/07

                                          /s/ Gregory G. Hollows
20                                        _____
21                                        GREGORY G. HOLLOWS
                                          UNITED STATES MAGISTRATE JUDGE
22

23   ggh:kj
     will615.sj
24

25

26

                                          33